IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 7 |
| DONALD M. LAUGHLIN, ) | |
| ) | |
|    Debtor. ) | Bankruptcy No. 05-05417 |
| ------------------------------ | |
| RMJ LEASING, INC., ) | |
| ) | Adversary No. 05-30186 |
|    Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| DONALD M. LAUGHLIN, ) | |
| ) | |
|    Defendant. ) | |

**ORDER RE: COMPLAINT TO DETERMINE DISCHARGEABILITY**

     This matter was heard on September 12, 2006 in Des Moines, Iowa pursuant to assignment.  Plaintiff RMJ Leasing, Inc. ("RMJ Leasing") appeared by its President Richard Miller and Plaintiff's attorney, Michael J. Cunningham.  Debtor Donald M. Laughlin appeared in person with his attorney, Edward Noyes. Evidence was presented after which the Court took the matter under advisement.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

**STATEMENT OF THE CASE**

     Debtor filed a voluntary Chapter 7 bankruptcy petition in the Southern District of Iowa on July 25, 2005.  RMJ Leasing was listed as a creditor in Debtor's bankruptcy petition.  RMJ Leasing filed the present complaint against Debtor seeking a determination of the dischargeability of a portion of its claim, alleging that Debtor obtained money from RMJ Leasing through fraud in violation of 11 U.S.C. § 523(a)(2).  Debtor denies the commission of any fraudulent acts.

**FINDINGS OF FACT**

RMJ Leasing is an invoice factoring company. Invoice factoring is a method used by companies to obtain quick payment on customer invoices. The practice of invoice factoring involves one company buying the invoices or accounts receivable of another company at a discounted rate. The seller of the invoice gains the liquidity it needs to pay its employees, pay its bills, and expand its business. Conversely, the company purchasing the invoices makes a profit once invoices are paid in full by the seller's customers.

Mr. Miller is the President of RMJ Leasing, Inc. He and his wife are its only shareholders. RMJ Leasing buys invoices from various businesses. The company ordinarily discounts invoices by three percent and pays the seller ninety-seven percent for each invoice it purchases.

Debtor operated a business known as ATA, Inc. ("ATA"). Debtor was the President of ATA. ATA employed drivers to haul automobiles by truck from a point of origin, such as a manufacturing plant, to their final destination, such as a sales lot. Debtor's business was growing and many of his clients were slow in paying their invoices. Thus he sought an agreement with RMJ Leasing to factor the invoices so he would have sufficient cash to cover payroll, gas, and the other costs of operating his business. In September 2004, ATA entered into an initial agreement with RMJ Leasing to factor its invoices. The parties entered into a subsequent factoring and security agreement on January 4, 2002. (Plaintiff's Ex. 34.)

RMJ Leasing submitted Exhibits 1 through 33 which are all invoices that were sent by ATA to RMJ Leasing. RMJ Leasing paid ATA the discounted rate on all of these invoices. Mr. Miller testified that Exhibits 1 through 33 do not constitute the entire body of business between the two firms but represent the portion which he feels was based upon some type of inappropriate conduct. For instance, RMJ Leasing would receive an initial invoice for a specific amount due. It would pay ATA the discounted rate on that invoice. Subsequently, an amended invoice would be received for the same transaction which was reduced by various amounts. The effect of these amended invoices was that RMJ Leasing lost money in the collection process. Other times, after having purchased invoices and submitting them for payment, RMJ Leasing was informed that ATA owed more money to the payor than the invoice reflected. In other words, the company owing money on the invoice would use the amount of the invoice to setoff an indebtedness already owed to them by ATA. Additionally, several of the invoices were reduced upon presentation because the

contracted number of automobiles were not actually hauled.

The most significant issues arose during March of 2002.  Mr. Miller testified that, since his operation consists of only three employees, the business shuts down for one week each year to allow all three to go on vacation.  Mr. Miller notifies his clients and sets up a communication system with them whereby he talks to them every day.  During this vacation week, Mr. Miller wires money to the various clients based upon this communication.  However, he does not physically see the invoices until he gets back from vacation.

Exhibits 11 through 23 were presented by ATA during the vacation week of March 24, 2002.  It is apparent that these invoices are of a different nature than the earlier invoices.  Exhibits 11 through 15 are each in the amount of $2,970.  Exhibits 16 through 23 are each in the amount of $2,805.  Each invoice is addressed to Midwestern Auto Carriers.  RMJ Leasing paid the factored amount on these invoices based upon a telephone conversation without viewing the invoices.  The revised invoices, which were at Mr. Miller's business when he returned from vacation, were all less than the amount discussed on the telephone while Mr. Miller was on vacation.

The parties do not dispute that over the course of time, the total amount of deficiencies became substantial.  RMJ Leasing sued ATA and Debtor, individually, in Colorado State Court.  The court entered a default judgment for principle damages in the amount of $121,813.64 plus interest and attorney's fees.  RMJ Leasing is not seeking denial of discharge on all of the deficiency but only on the 33 invoices which the company asserts are the product of fraud.  It alleges the shortage on these 33 invoices is approximately $44,000.00.

Mr. Miller testified that the company bases its fraud allegations on the fact that initial invoices should have been accurate and collectable when received.  None of these invoices was final.  All were inaccurate or subject to later modification in some respect.  Mr. Miller testified that every invoice was submitted with a dollar figure which was subsequently modified downward.  He felt that it was suspicious that not one of these invoices ever generated more money than the face value of the initial invoice.

Debtor explained that initially, Mr. Miller only agreed to factor invoices for completed jobs.  This arrangement is reflected in the factoring contract between the parties.  However Debtor stated that over time, this arrangement became unfeasible

3

due to his cash flow problems. Debtor testified that he discussed his problem with Mr. Miller. He stated that Mr. Miller agreed to begin factoring invoices ahead of time, but only if the invoiced load was actually on the truck, ready to be hauled. Debtor added that over time, with Mr. Miller's knowledge, he would prepare and submit invoices for contracted jobs that were a day or more away from being completed. Debtor used the term "prefactoring" for this business arrangement. Mr. Miller stated that while he has never heard the term "prefactoring," it was the parties' eventual understanding that invoices were submitted for work "to be completed within a reasonable length of time."

Dolores Johnson was an employee of ATA during this relevant period. In fact, she was employed primarily to be a liaison between RMJ Leasing and ATA. She testified that she was in contact with Mr. Miller on a daily or every other day basis. She testified that RMJ Leasing was very aware of all of the business dealings of ATA because of this constant interaction.

Debtor also explained the superficially suspicious series of "vacation" invoices. He testified that the fact that certain misstated invoices came in during RMJ's vacation period was merely coincidental and not based upon any type of intent to present inflated invoices which Mr. Miller would not see until he returned to work. Debtor testified that Exhibits 11 through 23 represent payments owed by Midwestern Auto Carriers to ATA under a specific contract. This contract was different from ATA's normal arrangement with the company, in that the payment terms were not on a "per load hauled" basis. Rather, Midwestern had entered into a fixed-price contract with Mitsubishi to carry a number of its cars to various locations across the country. In turn, Midwestern contracted with ATA on a flat-rate basis to haul the total worth of its contract with Mitsubishi — a set dollar amount rather than a per load deal. The cars were to be transported over an extended period of time.

Debtor stated that he entered into this arrangement with the full knowledge of RMJ Leasing. In order to comply with RMJ's method of factoring, Debtor divided the total contract price into fixed invoice amounts. In actuality, sometimes the manufacturer would state that it had a load ready for delivery and have fewer cars ready for transport than Debtor's invoice had indicated. Manufacturers would often demand that the load leave immediately and, therefore, the revised invoice would reflect a lesser amount. Additionally, Midwestern engaged in a practice of discounting the amount of invoices to take into account damages inflicted upon vehicles during transport or for various repairs.

4

Both parties agree that it was wrongful for Midwestern to engage in the practice of discounting and refusing to pay RMJ Leasing on the full amount of the invoice. Mr. Miller testified that RMJ Leasing did recover approximately $10,000 in a settlement agreement with Midwestern in connection with its discounting activity on certain invoices.

Finally, the pleadings in this case are directed against Donald Laughlin, individually. It is uncontested that the contractual arrangements were between RMJ Leasing and ATA, a corporation. Debtor has directed the Court's attention to the fact that the business relationship was between RMJ and ATA. Thus he argues that since this is his individual bankruptcy case, he is not liable for any conduct of the corporation. However, the default judgment entered by the Colorado State Court, is against ATA and Debtor, individually.

## CONCLUSIONS OF LAW

RMJ Leasing asserts the amounts owed by Debtor are excepted from discharge under § 523(a)(2)(fraud or false pretenses). This section provides in pertinent part:

> (a) discharge under section 727 . . . of this title does not discharge an <u>individual debtor</u> from any debt . . .
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>>
>>> (A) false pretenses, a false representation, or actual fraud.

11 U.S.C. § 523(a)(2)(A) (emphasis added).

The plain language of § 523 indicates that it applies to the financial obligations of individuals debtors. In this case, ATA — a corporation — is the entity that has accumulated debt with its creditor, RMJ Leasing. Through its denial of discharge claim, RMJ Leasing essentially asks the Court to disregard the corporate form and find that the debt is owed by Mr. Laughlin, the individual debtor in this case, rather than ATA. Under normal circumstances, a corporation is an entity separate and distinct from its shareholders. <u>Northwestern Nat'l Bank v. Metro Ctr., Inc.</u>, 303 N.W.2d 395, 398 (Iowa 1981). However, the corporate form may be disregarded if "(1) the corporation is undercapitalized, (2) without separate books, (3) its finances

are not kept separate from individual finances, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed or (6) the corporation is merely a sham." Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc. 519 F.2d 634, 638 (8th Cir. 1975) (applying Iowa law).

The Lakota Girl Scout Council test "properly enumerates the factors that may be considered in determining if a corporation is merely the alter ego of its dominant shareholder." Id. Evidence was introduced at trial which leads this Court to find that Debtor should not be afforded the protections of ATA's corporate form in this matter. Debtor was the dominant shareholder of ATA; he exerted control over the company and its finances; Debtor also established the practice of prefactoring which caused ATA to deviate from its contractual obligations with RMJ Leasing. In short, the evidence suffices to show that Debtor dominated and controlled the business and it was merely his alter ego.

## § 523(a)(2)(A) DISCHARGEABILITY

To prevail under § 523(a)(2)(A), RMJ Leasing must prove each of the following five elements: (1) Debtor made false representations; (2) Debtor knew the representations were false at the time he made them; (3) Debtor made the representations with the intention and purpose of deceiving RMJ Leasing; (4) RMJ Leasing justifiably relied on the representations, Field v. Mans, 516 U.S. 59,72 (1995); and (5) the RMJ Leasing sustained the alleged injury as a proximate result of the representations having been made. In re Van Horne, 823 F.2d 1285, 1287 (8th Cir. 1987) (abrogated on other grounds by Grogan v. Garner, 498 U.S. 279 (1991)). Additionally, the Court must find that the debt in question arose from the debtor's fraudulent acquisition of money, property, services or credit, or that the debtor obtained some benefit through the fraud or misrepresentation. In re Maurer, 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000).

RMJ Leasing must prove the elements of its claim under § 523(a) by a preponderance of evidence. Grogan, 498 U.S. at 286-87. As the primary goal of the Bankruptcy Code is to provide honest debtors with a "fresh start," exceptions to discharge are generally construed narrowly against the creditor and liberally for the debtor. In re Kline, 65 F.3d 749, 751 (8th Cir. 1995). These considerations, however, "'are applicable only to honest debtors.'" Van Horne, 823 F.2d at 1287, quoting In re Hunter,771 823 F.2d 1126, 1130 (8th Cir. 1985).

## FALSE REPRESENTATIONS

6

RMJ Leasing must first establish that Debtor made a false representation. A "representation" is any word or conduct asserting the existence of a fact. See Matter of Scarlata, 979 F.2d 521, 531 (7th Cir. 1992). It may also include silence if a party fails to disclose material facts to someone who has good reason to believe such facts will be disclosed. Van Horne, 823 F.2d at 1288.

Under some circumstances, an invoice may be construed as a type of "representation." See In re Olson, 325 B.R. 791, 800 (Bankr. N.D. Iowa 2005) (invoices presented by defendant to obtain payment for expenses not incurred are false representations); In re Nicsinger, 136 B.R. 228, 233 (W.D. Mo. 1992) (material facts regarding pre-invoicing practice omitted from invoices may constitute false representations).

RMJ Leasing asserts that the invoices submitted by Debtor are representations of money due to ATA from its customers. Each of the invoices in question stipulates specific pick-up and delivery points. Further, the invoices include details such as the number of units to be hauled and the total amount due to ATA. Each invoice serves to memorialize a debt owed by a specific company to ATA for the completion of a haul described in detail by the terms contained within the document. The Court finds RMJ Leasing has established by a preponderance of the evidence that the invoices purport to represent the existence of debt owed to ATA by its customers.

Additionally, the Court finds that the representations made by the Debtor were not true. Debtor submitted purchase summaries to RMJ Leasing that asserted that "ATA agrees these invoices are true and correct as defined in the Factoring Contract with RMJ Leasing, Inc. of Lakewood, CO." (See Plaintiff's Ex. 1-33.) The factoring contract required each invoice to be "unconditionally owed and . . . due without defenses, disputes, offsets, counterclaims or rights of return or cancellation." (Plaintiff's Ex. 34.) Thus the invoices asserted the existence of a fact, a specific debt owed, that was simply not true. As such, they are false and constitute false representations.

A determination of nondischargeability under § 523(a)(2)(A) requires a finding that Debtor knew the representation was false at the time he made it. Debtor's own testimony establishes that at the time he submitted the invoices, he knew they were untrue for various reasons — i.e., the job had not yet been completed, or was subject to certain setoff rights. Debtor made no effort to conform to the terms of the factoring contract. The invoices he presented to RMJ Leasing were not "true and correct" or

"unconditionally owed." Debtor was fully aware of these facts. The Court finds that Debtor knew his representations were false when made.

### INTENT TO DECEIVE AND JUSTIFIABLE RELIANCE

To prevail in its claim under § 523(a)(2)(A), RMJ Leasing must prove that Debtor made the representations with the intention and purpose of deceiving it. RMJ Leasing must also demonstrate that it justifiably relied on Debtor's representations in choosing to advance money to him under the factoring contract. See Field, 516 U.S. at 72.

RMJ Leasing has failed to establish that Debtor presented inaccurate invoices with an intent to deceive the company. "'Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act.'" In re Kruger, No. 01-9168, 2002 WL 1483870, at *4 (Bankr. N.D. Iowa July 9, 2002), quoting In re Duggan, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994). It is the conclusion of this Court that Debtor did not have such intent. While Debtor's representations were clearly inaccurate, testimony presented by the parties establishes that Debtor and his employee Delores Johnson took measures to ensure that RMJ Leasing was aware of the prefactoring practice. Significantly, Johnson testified that she was in contact almost daily with Mr. Miller, the president of RMJ Leasing, about the progress of uncompleted work that had been invoiced to the company. Mr. Miller substantiated the testimony of Debtor and Johnson, stating that he knew invoices were submitted for uncompleted work that was to be finished "within a reasonable length of time."

Even if RMJ Leasing had established an intent to deceive, its claim must fail for another reason. It has failed to establish justifiable reliance on Debtor's misrepresentations. Whether reliance is justifiable is "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases." Field, 516 U.S. at 71. Under the circumstances of this case, RMJ Leasing was not justified in relying on the representations made by Debtor.

The evidence is overwhelming that RMJ Leasing was intimately familiar with Debtor's business. As president of RMJ Leasing, Mr. Miller was in almost constant contact with Debtor's employees and even made phone calls directly to Debtor's customers when he felt it was necessary to confirm the existence of a job.

8

Further, each invoice submitted to the Court arose during the second year of business between the two companies; that is, after RMJ Leasing agreed to renew a factoring contract with Debtor. The Court finds that RMJ Leasing purchased each of the invoices in dispute after it had become aware of Debtor's prefactoring practice. The evidence shows a lack of reliance on RMJ Leasing's part with respect to the purchase of these invoices.

RMJ Leasing has failed to meet its burden to satisfy the five elements of a nondischargeability claim. The evidence demonstrates both a lack of intent to deceive by Debtor and lack of justifiable reliance by RMJ Leasing. Therefore, the Court holds RMJ Leasing's claim is not excepted from discharge under § 523 (a)(2)(A).

WHEREFORE, Plaintiff has failed to satisfy the necessary elements of 11 U.S.C. § 523(a)(2)(A) by a preponderance of evidence.

FURTHER, Plaintiff's complaint to except debt from discharge is DENIED.

DATED AND ENTERED: October 16, 2006

_____
PAUL J. KILBURG
BANKRUPTCY JUDGE